An appropriate order is being entered by the Court.

The **LONG ISLAND RAIL ROAD COMPANY**, Plaintiff,

v.

**UNITED STATES** of America and Interstate Commerce Commission, Defendants,

and

American Paper Institute, Inc., Georgia Pacific Corporation, National Industrial Traffic League, and U. S. Plywood-Champion Papers, Inc., Intervening Defendants.

**Civ. A. No. 69–C–549.**

United States District Court
E. D. New York.

Nov. 13, 1969.

George M. Onken, Richard H. Stokes, Long Island Rail Road, Jamaica, N. Y., for plaintiff.

Richard W. McLaren, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Edward R. Neaher, U. S. Atty., E.D.N.Y., Brooklyn, N. Y., for the United States, by Jerome E. Sharfman, Washington, D. C.

Jerome E. Sharfman, Washington, D. C., for I.C.C.

John M. Cleary, Donelan, Cleary & Caldwell, Washington, D. C., for American Paper Institute, Inc.

Duane A. Bartsch, Smart & Bartsch, Portland, Or., for Georgia-Pacific Corp. and U. S. Plywood-Champion Papers, Inc.

John H. Caldwell, Donelan, Cleary & Caldwell, Washington, D. C., for National Industrial Traffic League.

Before HAYS, Circuit Judge, and BARTELS and TRAVIA, District Judges.

TRAVIA, District Judge.

For the purpose of maximum utilization of boxcar equipment incentive rates were offered by the Long Island Rail Road as a result of which shippers frequently load boxcars so that one door of the car is blocked. From a practical standpoint, unloading at the point of destination must be accomplished through the same door as is used for loading. If the car arrives with the "open door" side facing the consignee's platform, no turning of the car is necessary. If, however, the car arrives in the opposite position, a problem arises as to unloading unless it is turned.

The plaintiff, Long Island Rail Road (LIRR), filed schedules, effective date November 29, 1967, proposing rates for the performance of car turning services at specified stations. Upon protests, the Board of Suspension of the Interstate

Commerce Commission (ICC) suspended the operation of the proposed schedules until June 28, 1968.

An investigation, utilizing the ICC's "modified procedure," 49 C.F.R. § 1100.-45, et seq., was instituted and, on May 8, 1968, Review Board No. 4 found that car turning was a special service and that a reasonable charge could be made for such service. Review Board No. 4 permitted new schedules to be filed without differential in charges for turning "placarded" as opposed to "unplacarded" freight cars. New schedules were filed to take effect June 28, 1968.

Protests were then filed to the order of May 8, 1968. The plaintiff voluntarily cancelled the amended schedules pending a final decision in the proceeding.

Appellate Division 2 of the ICC on January 7, 1969, reversed the findings of Review Board No. 4 and found that the obligation of the LIRR, when previously notified by placards on cars and notices in bills of lading, to turn freight cars is a part of the transportation service covered by the "linehaul" charges and that such service is not a "special" service, for which additional charges may be made. This decision was reported as Car Turning Charge, at Points on Long Island, N. Y., 332 ICC 795. A petition for a rehearing was denied on May 9, 1969. Since the LIRR had already voluntarily suspended its proposed tariffs, it was not necessary for the ICC to issue an order requiring the withdrawal of the tariffs. Instead the ICC merely ordered that the " * * * proceeding be, and it is hereby discontinued." 332 ICC at 800. However, the decision of the ICC concerning the validity of the tariffs was on the merits and we shall thus treat its decision as an order declaring the proposed tariffs illegal.

A complaint filed in this Court, as amended on June 19, 1969, seeks review of the determination by Appellate Division 2. Plaintiff's motion for a temporary restraining order was denied by Judge Travia on May 26, 1969, and a motion for a preliminary injunction was denied on July 7, 1969 by this Three-Judge District Court, convened pursuant to 28 U.S.C.A. §§ 2325, 2284. Answers were filed by the defendants and intervenors. The plaintiff's action for judgment setting aside the Division 2 orders as " * * * not supported by the evidence of record, * * * arbitrary and capricious, and * * * without warrant in law * * *," for enjoining enforcement of the order, and for remanding the case " * * * to the I.C.C. for further proceedings * * *" was heard upon extensive briefs and oral argument of counsel before this Court on October 28, 1969.

The issues are:

First, whether the Appellate Division 2 findings are invalid in that they change existing tariffs contrary to law to the extent that they find that freight cars must be turned without charge if they are placarded and have notice in the bills of lading. The parties are in agreement that there are no express specific tariffs of the LIRR providing for the placarding of cars and putting of notices in bills of lading;

Second, whether the Appellate Division 2 findings were based upon evidence outside the record, thereby depriving plaintiff of the opportunity of rebutting the allegedly crucial material;

Third, whether the LIRR is being deprived of its property without due process of law and contrary to the Administrative Procedure Act, 5 U.S.C.A. § 500 et seq., in that the findings of the ICC will increase the responsibilities, costs and expenses of the railroad; and

Fourth, whether the findings and order of the ICC is void for "indefiniteness, lack of certainty" and "because they affect tariffs and situations not then before the ICC."

After the commencement of this action, the LIRR filed a tariff with the ICC, denominated in these proceedings as Note 817 to Supplement 29, to Official List of Open and Prepay Stations 83, ICC A-48 [hereafter "Note 817"]. Motions were filed by the government,

the ICC, and the intervenors, seeking a writ under 28 U.S.C.A. § 1651(a) enjoining the railroad from acting under Note 817, or leave to amend the answer to include a cause of action under 49 U.S.C.A. § 20 par. (9) for substantially the same relief. These motions were disposed of by the agreement of the LIRR voluntarily to withdraw the tariff with Note 817 by a Special Supplement, to be effective Friday, November 7, 1969.

## I

The Appellate Division based its decision upon an interpretation of what line-haul delivery should include, in the changed circumstances of one-sided loading resulting from incentive rates, in order to complete a "practical delivery." [1]

There is no dispute that the ICC has discretion to decide whether a given service should be deemed a part of the line-haul service and covered by the line-haul rate or a terminal service subject to an extra charge.

However, plaintiff argues that the ICC order, by requiring the LIRR to perform a newly defined service under special conditions, violates 49 U.S.C.A. § 6(1) and (7) in that it requires a change in service (affecting rates and costs to the railroad) without the LIRR's having a tariff filed which provides for the preconditions to that service.[2]

It argues that 49 U.S.C.A. § 6(1) requires separate statement of what plaintiff contends are "rules" or "privileges" by the following language:

"(1) Every common carrier * * shall file with the Commission * *

schedules showing all the rates, fares, and charges for transportation * * *. The schedules * * * shall * * * state separately, * * * all privileges * * * granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate' of such * * * rates, fares, and charges, or the value of the services rendered to the * * * shipper, or consignee."

Plaintiff contends that, even if the turning of placarded and bill-of-lading noted cars was properly found to be a service within the line-haul rates, it is also a "privilege" or governed by a "rule" or a "regulation" which are required by § 6(1) of the Interstate Commerce Act, 49 U.S.C.A. § 6(1), to be stated separately in tariffs and which § 6(7) forbids a carrier to extend to shippers unless specified in a tariff. Thus, the argument runs, there is a rule, not filed as a tariff, but recognized by the ICC order, with provisions for shippers to obstruct doors in loading, give notice in bills of lading, and placard cars, enabling the shipper to bind and obligate the carrier to deliver the car in a certain manner which affects the value of the service to the shipper and/or the consignee. Alternatively to the argument that the ICC order provided for an unfiled "rule" is the argument that, by the ICC order, shippers have been given—again without a published and filed tariff providing for it—the privilege of blocking a door under the incentive rates with delivery guaranteed in a certain manner. To support its notion that the ICC order established, without tariffs, rules or privileges which the statute requires to be filed as a tariff, plaintiff

---

1. Contrary to the ICC's position, it does not appear from the opinion of Appellate Division 2 that the Review Board No. 4 finding that the LIRR did not hold itself out to turn cars was reversed. Instead, Appellate Division 2 seems to have left the question open, and did not base its decision on a contrary finding. Thus, Appellate Division 2 noted that Review Board No. 4 had " * * * *relied* on the *fact* that the respondent had not in the past held itself out to perform car turn-

ing as part of the line haul. * * * *" (emphasis added). Although a finding that car turning was a special service was reversed, 332 ICC at 798, the "fact" upon which the Board "relied," of the LIRR's not holding itself out to perform turning services, was not reversed.

2. In fact, there is no specific tariff provision establishing or governing the practice of placarding cars and putting notices of placards in bills of lading.

cites tariffs of two other railroads in which the turning service for placarded and bill-of-lading noted cars is offered free of charge. Plaintiff contends that in each of these cases, the railroad recognized the need for a tariff, even to provide these services free of charge. That the ICC found that any charge for the service would be unjust and unreasonable, 332 ICC at 799–800, does not, in plaintiff's argument, overcome the failure to provide, by tariff, rules governing the existence and mode of operation of the service, or the failure to provide for the "privileges" granted even if they are within the line-haul service.

Assuming that there is some "rule" providing for blocked-door loading, and placarding and noted bills-of-lading, plaintiff argues that the regulations of the ICC itself, 49 C.F.R. § 1300.4(h), require that the rule be included in a filed tariff. Section 1300.4(h) reads in part:

"Tariffs shall contain * * * :

(1) Rules and regulations which govern the tariff. * * * Under this head all of the rules, regulations, or conditions which in any way affect the rates named in the tariff shall be entered. * * * A special rule affecting a particular item or rate must be specifically referred to in such item or in connection with such rate."

In addition, it is suggested that if there is a privilege, or a rule which in effect grants a privilege, which is not specified in a tariff, § 6(7) of the statute is violated. That section provides, in part:

"No carrier * * * shall * * * extend to any shipper or person any privileges * * * in the transportation of * * * property, except such as are specified in such tariffs."

At the crux of plaintiff's argument is the proposition that the ICC cannot find that a lawful tariff may contain a silent or unstated rule which affects the value of the service offered. Or, alternatively stated, the statute and regulations are assertedly violated because there is a rule granting a privilege not specified in

the tariff or at the least a rule providing a service in connection with transportation not provided for by tariff.

Not only are there no express tariff provisions for the alleged rule or privilege, but also the Association of American Railroads (AAR) and origin line circulars, not being filed tariffs of plaintiff's railroad, did not fill in the gap in tariffs; nor, apparently, is the gap filled by any prior holding out by the LIRR to perform the turning service.

Plaintiff in effect contends that the only governing "rule" is the opinion of the ICC Appellate Division 2, in the paragraph which states:

"We find, That (1) where unloading can be accomplished only from one side of a car because the opposite side is blocked or obstructed, and the relevant information in regard to placement for unloading is placarded on the car and included on the bill of lading, the delivery required of the respondent under its line-haul rate is not completed until the car is properly positioned for unloading, and under such circumstances, no additional charges for turning placarded cars are warranted; and (2) the proposed charges for turning a car where the notice and placarding are not as described in part (1) of these findings, are just and reasonable." 332 ICC at 800.

Although the placarding and notices in the bills of lading are attacked by the plaintiff, no attack is made on the validity of the underlying determination by the ICC that the car turning, in the specified circumstances, is included in delivery as part of the line-haul "transportation service" which the LIRR holds itself out to perform under 49 U.S.C.A. §§ 1(4), 1(3) (a). If such an attack were made, the findings would have to be sustained as within the discretion and expertise of the ICC and supported by substantial evidence in the record. 5 U.S.C.A. § 706; see Secretary of Agriculture v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954).

The car turning is thus not a special service but is only a part of the normal service which it is the obligation of the carrier to perform. No "privilege" arises to shippers from the ability to notify the carrier that the circumstances in which its duty arises exist. Placarding and the concomitant notices in the bills of lading have developed as the obvious means of informing the carrier that one side of a car must be turned toward the consignee's loading platform in order " * * * to make [it] accessible to the consignee." Secretary of Agriculture v. United States, *supra*, 347 U.S. at 647, 74 S.Ct. at 828. This puts "* * * the delivering carrier * * * in a position to take advantage of the placard and to deliver in the manner required. * * *" Car Turning Charge, *supra*, 332 ICC at 799.

The Interstate Commerce Act does not require tariffs to state all of the myriad details of the transportation service. Rates are stated from point of shipment to delivery at point of destination. Delivery includes not only placing the cars on the proper side track, but also turning them when necessary, within the transportation rate. Just as a tariff providing that cars must be placed on a side track of a consignee when the carrier is notified of the consignee's identity and location in the bill of lading would be superfluous, since that duty is already in the line-haul transportation obligation of the carrier, *cf.* Los Angeles Switching Case, 234 U.S. 294, 34 S.Ct. 814, 58 L.Ed. 1319 (1914); Chesapeake & Ohio Ry. Co. v. Westinghouse, Church Kerr & Co., 270 U.S. 260, 46 S.Ct. 220, 70 L.Ed. 576 (1926) ("spotting service" included in "line-haul" tariffs; extra charge for performing service illegal; apparently no separately stated express "spotting service" tariff); and just as the duty of unloading livestock may be included within the line-haul service, even though not separately stated, and thus may not require a separate tariff or be subject to a separate charge, *see* Adams v. Mills, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184 (1932); so also a tariff providing for placarding cars for turning and putting rates in bills of lading may be superfluous and, as in the cases of the two carriers cited by the LIRR, may well be filed only (as was suggested at oral argument) in an abundance of caution. *See generally* ICC v. Detroit, G. H. & M. Ry. Co., 167 U.S. 633, 645–646, 17 S.Ct. 986, 42 L.Ed. 306 (1897). Where the ICC may reasonably conclude that a particular service is within the line-haul rates for transportation and delivery, the details of that service need not be separately stated under § 6(1).

This holding that the failure of any tariff to state the specific methods by which the shippers may inform the LIRR that its car turning service must be performed does not cause plaintiff to violate either § 6(1) or § 6(7), since no privilege is granted nor is a rule provided. That the railroad may now be informed of the need to turn cars by placards on the sides of the cars with notations in the bills of lading, does not, of course, prevent the LIRR from changing the method. If the carrier is dissatisfied with this manner of marking cars and informing it of the necessity for it to perform its duty, it may, under 49 U.S.C.A. § 1(6), " * * * establish * * * just and reasonable regulations and practices affecting * * * the * * * form, and substance of * * * bills of lading, [and] the manner and method of * * * marking, packing, and delivering property for transportation * * *."

## II

Analysis of the opinion of Appellate Division 2 and of the record before the ICC indicates that the ICC's findings were not based on evidence outside the record. The LIRR claims that certain circulars of the Association of American Railroads and origin railroad lines were used as the basis for the finding that:

"Boxcars can ordinarily be unloaded from either side. The advent of so-called 'incentive rates,' carrying loads

pursuant to full visible capacity rules, necessitated the blocking of one door of the car because shippers turned to mechanical loading and unloading of shipments on pallets. Moreover, as suggested in circulars, issued by the Association of American Railroads and by the individual origin lines, extensive blocking and bracing is necessary in order to avoid damage to the lading; this type of loading also requires that one door be obstructed." 332 ICC at 796;

and for the finding that:

"Here, unless a car is placed with one side or end facing the unloading platform, the receiver is denied reasonable access to his freight. One door is obstructed, so that it is either impossible or impractical to unload from that side. This situation has been imposed, or at least encouraged, by the railroads themselves by publishing incentive rates and suggested methods for the loading of cars." 332 ICC at 798–799.

From a careful reading of the Division 2 decision, it appears that the circulars were not used for any essential findings by the ICC, but only as explanation of why a method of loading and marking cars had developed historically. The finding was that "[m]oreover * * * extensive blocking and bracing is necessary * * *." 332 ICC at 796. The ICC only noted that this procedure had in fact been recommended by the circulars in question.

The record before the ICC shows that testimony about the circulars in question had been presented, from which the inference could properly be drawn that the circulars had recommended the type of loading found to have been "necessary." Thus, in the statement of John H. King of the Georgia-Pacific Corporation, pp. 2–3, the following appears: "Our shipments are carefully loaded for safe transportation and comply with AAR Circular No. 8 and SP Circular No. 33 'recommended methods for plywood loading'." Similarly, in the statement of Merle R. Johnson, of US Plywood-Cham-

pion Papers, at p. 2, is the comment that "[o]ur shipments are loaded and braced for safe transportation in accordance with AAR and individual railroads' 'recommended methods for loading'." And equivalent statements appear in the Opening Statement of Plywood Distributors, Inc., by Mr. Bieberstein: "Plywood Distributors Inc. specifies on all purchase orders that the shipments are loaded and braced for safe transportation, in accordance with AAR and individual railroads' specifications for 'recommended methods for loading'." Opening Statement, Plywood Distributors, Inc., at p. 2.

In the second attacked finding, the ICC found only that "One door is obstructed, so that it is either impossible or impractical to unload from that side." The next sentence, with the reference (apparently) to the circulars, is commentary, an explanation of how this situation came about, but certainly not crucial to the finding of the need for one-sided unloading. Indeed, insofar as it is a finding, it is a proper inference from the statements of the three protestants, since they testified that their shipments were loaded in accordance with the railroad circulars.

 Finally, the contents of the various circulars were not in issue, and were not used, so that the Best Evidence Rule does not apply to require the production of the circulars themselves, and, even if the Best Evidence Rule were applicable, the failure to object to the presentation of the statements about the circulars waived any objection the LIRR may have had. McCormick, Law of Evidence, § 52 at 115.

### III

██ Plaintiff argues that in some manner, the ICC has treated various AAR and origin line circulars, not filed as tariffs of the LIRR, as amending the [LIRR] 'incentive' rate tariffs so as to authorize and permit the shippers to bind the carriers to a certain form of delivery by inserting a notation on the Bill of Lading and placing a placard

---

upon the freight car. The railroad argues that tariffs cannot be amended by the mere issuance of a circular. This is a correct statement of the law. See 49 U.S.C.A. § 6(1); 49 C.F.R. § 1300.-14(b); 49 U.S.C.A. § 6(3); 49 C.F.R. § 1300.14(a); 49 U.S.C.A. § 6(7); *cf.* Southern Ry. Co. v. Prescott, 240 U.S. 632, 638, 36 S.Ct. 469, 60 L.Ed. 836 (1915); Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939).

However, this contention of the LIRR is falsely grounded on the notion that there was any finding at all that the LIRR tariffs were "amended" by the circulars. The LIRR argument is particularly based on the notion that the Appellate Division 2 somehow found that the circulars provided both recommended loading instructions and advice on inserting notations in Bills of Lading and placards on freight cars. The railroad also argues that consequently the Division 2 treated these circulars as amending the tariffs of the LIRR. However, the two references to the circulars in the decision, 332 ICC at 796 and at 799, deal only with recommended loading procedures, where one door is obstructed. No reference is made to any connection between the circulars, the placarding and the bills of lading notations; nor is the finding by the Division that the carrier has the duty to turn placarded cars where one door is obstructed in any way tied to the existence or not of the circulars in question. In addition, the references to the circulars in the record, as discussed herein, *supra*, at p. 994, dealt with the loading practices, but not with placarding and notations. Insofar as the circulars have any effective relation to this case, their existence would seem only to affect the manner in which goods were loaded on freight cars; whether, under the ICC order, cars which are loaded in accordance with the circulars are to be turned before delivery is complete depends on whether they are placarded and with proper notations. Properly loaded cars may, as is obvious from the separate statement of rates in the proposed LIRR tariff, Rule 38, 332 ICC at 800-801, be either placarded with notations on bills of lading or not. Nothing appears in the record or the decision to indicate that placarding derived from the circulars.

IV

Finally, the LIRR argues that the ICC orders are too broad and sweeping. This is based on the notion that the findings are directed to other commodities than those—lumber, plywood, and paper—sent by the protestants on the railroad, in that the findings are directed to any and all 'incentive' rates where notations are made in the Bills of Lading and placards are affixed to the freight cars. The Division 2 finding does not rest on the existence of any incentive rates, nor is it directed to any particular commodities. Instead, it is directed to any situation " * * * where unloading can be accomplished only from one side of a car because the opposite side is blocked * * * and the relevant information * * * is placarded on the car and included on the bill of lading * * *." 332 ICC at 800.

In the ICC order for an investigation of the tariffs in question, dated November 28, 1967, it was ordered:

"That the investigation in this proceeding shall not be confined to the matters and issues hereinbefore stated as the reason for instituting this investigation, but shall include all matters and issues with respect to the lawfulness of the said schedules under the Interstate Commerce Act."

Thus, the investigation was not limited to any specific commodities, but to the rates established for the car turning by the LIRR in general.

Similarly, the order following this investigation was not limited to any particular commodities (although the only protestants were concerned with particular commodities), but to the rate tariffs as filed by the LIRR. *Cf.* 49 U.S.C.A. § 15(1) (ICC power to call hearing to determine justness and reasonableness of

" * * * any rate, fare, or charge whatsoever * * *," with or without complaint, on its own initiative; order may require carrier to " * * * cease and desist from [a] violation to the extent * * * [it] does or will exist. * * "). *Compare* 49 U.S.C.A. § 13(1) (formal complaints) *with* 49 U.S.C.A. § 15(1) and (7) *and* 49 C.F.R. § 1100.-42(a) (hearings called by ICC, or after "protest").

No excessive broadness of the finding appears. If the LIRR at some future time considers the rates as applied to commodities other than those which were involved in the protests before the ICC are unjust or unreasonable, it may file new tariffs and have the issue decided anew.

Accordingly, it is

Ordered that the motions of the defendants and intervenors for mandatory or injunctive relief are denied; and it is further

Ordered that the findings and order of the Interstate Commerce Commission, Appellate Division 2, are affirmed, and it is further

Ordered that the complaint is dismissed.