ARCO ALASKA, INC., et al., Petitioners

v.

FEDERAL ENERGY REGULATORY COMMISSION and United States of America, Respondents

MAPCO Alaska Petroleum, Inc., et al., Intervenors.

Nos. 94–1774, 95–1009, 94–1044 and 95–1066.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1996.

Decided July 23, 1996.

Steven G. Reed, Washington, DC, argued the cause for petitioner ARCO Transportation Alaska, Inc. With him on the briefs was Steven H. Brose, Washington, DC. Matthew W.S. Estes, Washington, DC, argued the cause for petitioners ARCO Alaska, Inc., et al. With him on the briefs were C.M. Naeve, Washington, DC and Timothy R. Thomas, Ravenna, OH. John P. Griffin, Assistant Attorney General, Juneau, AK, was on the briefs for petitioner State of Alaska. Robert H. Loeffler, Washington, DC, entered an appearance.

Samuel Soopper, Attorney, Federal Energy Regulatory Commission, argued the cause for respondents. Jerome M. Feit, Solicitor, was on the brief. John J. Powers, III, and Robert J. Wiggers, Attorneys, United States Department of Justice, Washington, DC, entered an appearance.

John E. Kennedy, Houston, TX, argued the cause for intervenors. Albert S. Tabor, Jr., Houston, TX, Dean H. Lefler, Houston, TX, Randolph L. Jones, Jr., Tulsa, OK, Clifton D. Harris, Jr. and James E. Prince, Houston, TX, were on the joint brief. Steven H. Brose, Washington, DC, entered an appearance for intervenor ARCO Transportation Alaska, Inc.

Before: WILLIAMS, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The heyday of the Trans Alaska Pipeline System ("TAPS") is over. The large oil fields on the North Slope, from which the pipeline has long carried oil 800 miles to Valdez, are aging. With the decline in production TAPS is carrying fewer barrels of petroleum today than in the past. This decline has critical implications for rates charged on the pipeline.

Petitioners challenge the continued validity of a ratemaking method designed when the pipeline operated at capacity to compensate for the greater opportunity costs of carrying denser, more viscous oil as opposed to "lighter" oil. They claim that because the pipeline now operates at less than maximum capacity, there are no opportunity costs to carrying "heavy" oil, only a slightly increased cost for more fuel and drag-reducing agent. Under current conditions the traditional rate differentials between the two types are far greater than these costs. Petitioners therefore assert that continued use of the differentials constitutes discriminatory pricing in violation of § 2 of the Interstate Commerce Act ("ICA"), 49 U.S.C. app. § 2. We agree that the Commission has not justified its sticking to the formerly appropriate method. We

also reverse the Commission's determination that the pipeline must publish certain information about its operations in tariff form.

## I. Use of "Pumpability Factors" in Setting Rates

The pipeline is owned in varying percentages by seven corporate affiliates of North Slope producers (the "TAPS carriers"), and operated by their jointly owned operating company, the Alyeska Pipeline Service Company. The carriers file tariffs each year, with rates that are to be calculated in accordance with the TAPS Settlement Methodology set forth in the 1985 TAPS Settlement Agreement approved by FERC.

Four different petroleum streams—from each of the major oil fields on the North Slope—are tendered to TAPS at Pump Station 1 for delivery to Valdez. Variations in the density and viscosity of these streams affect the maximum flow rate of TAPS—the maximum number of barrels that TAPS can transport in a day. In order from lightest to heaviest (in terms of viscosity and density), the streams are: Lisburne, Sadlerochit, Endicott, and Kuparuk. The greater the density and viscosity of the stream (or mixture of streams), the lower the maximum flow rate.

At peak North Slope production, the number of barrels tendered to TAPS exceeded capacity. Because TAPS's maximum flow rate was lower if it was carrying denser and more viscous petroleum, a barrel of such petroleum displaced more than a barrel of lighter petroleum. To compensate for the opportunity cost of carrying heavy petroleum at maximum flow, TAPS carriers charged shippers of this petroleum an extra amount per barrel, based on a multiplier that in the TAPS Settlement Methodology is dubbed a "pumpability factor." The Methodology defines it as "the decimal fraction which expresses the relationship of the ability of TAPS to transport a particular type of petroleum relative to the ability of TAPS to transport Standard Petroleum," which in turn is defined in another agreement as Sadlerochit oil. (Sadlerochit was evidently chosen simply because it was the largest stream entering TAPS.) Because the relevant circumstances (such as average temperature) change over time, Alyeska calculates the pumpability factors each year. For any stream other than Sadlerochit, it uses a formula that compares the maximum number of barrels that can be transported by TAPS in a day carrying only Sadlerochit with the maximum number when TAPS is carrying a stream of 75% Sadlerochit and 25% of the other stream. The equation is:

$$1 + (Q_o - Q_i)/(Q_i/4) = \text{pumpability factor}$$

(where $Q_o$ is the maximum flow rate, in barrels per day, of 100% Sadlerochit, and $Q_i$ is the maximum flow rate of a mixture of 75% Sadlerochit and 25% stream i). The resulting pumpability factor is an estimate of the number of barrels of Sadlerochit that are displaced by a barrel of another stream when TAPS is at maximum capacity. In 1992, for example, Alyeska calculated the maximum flow rate for 100% Sadlerochit as 2,112,000 barrels per day, but for a mixed stream of 75% Sadlerochit and 25% Kuparuk as 2,078,000 barrels per day. Plugging these numbers into the formula above yielded a 1992 pumpability factor of 1.065 for Kuparuk. (The pumpability factor for that year for Lisburne, the lightest of the streams, was 0.966.) The factor is applied to both fixed and variable costs, and in 1992 it resulted in an average rate for transportation of a barrel of Kuparuk 22 cents higher than the average rate for a barrel of Sadlerochit.

Today, however, TAPS carries a good deal less than its maximum capacity, and all parties agree that it will never again approach its maximum flow. TAPS is continuously able to carry all barrels tendered to it, and adding barrels of heavier petroleum does not change the flow rate. In fact, for operational reasons the pipeline is always kept full (with no air in it); when the volumes tendered are low, the speed of the stream is reduced. As we understand the record, then, variations in the heaviness of oil do not now affect the rate of flow one way or the other once extra fuel and drag-reducing agent are added. Thus the opportunity cost differential that originally justified the rate differential has disappeared. Indeed, all parties agree that the pumpability factors do not at all reflect the difference in the cost of transporting the

different streams of petroleum. Yet sur- charges based on pumpability march on.

This rate structure was challenged by sev- eral North Slope producers, the State of Alaska, and the FERC staff, who were joined by two of the TAPS carriers (petitioners ARCO Transportation Alaska, Inc. ("ATA") and Unocal Pipeline Company ("UPC")). They relied primarily on § 2 of the ICA, 49 U.S.C. app. § 2, prohibiting discriminatory rates. Opposing them were the remaining TAPS carriers, an in-state refiner (MAPCO Alaska Petroleum), and one producer (Exxon Company, U.S.A.), the intervenors before us here. FERC's Oil Pipeline Board set the issues for hearing before an administrative law judge, who held that use of the pumpabil- ity factors resulted in tariff rates that were unjust, unreasonable and discriminatory un- der 49 U.S.C. app. §§ 1(5) and 2. *Amerada Hess Pipeline Corp.,* 64 FERC ¶ 63,008 at 65,029–32 (July 15, 1993) ("Initial Decision"). The ALJ found that there were some addi- tional costs to shipping heavier petroleum, in the form of more fuel and drag-reducing agent. *Id.* at 65,033. But the parties agree that these costs amount to no more than about 3 cents per barrel, obviously much less than the rate differences caused by use of the pumpability factors.

The ALJ nonetheless accepted testimony that the pumpability factors measured "use of capacity." *Id.* at 65,029. But he made clear that he understood the term to refer to "measurements of differences in *attainable throughput,*" *id.* (emphasis added), which ap- pears to mean precisely that factor that the parties all agree is no longer pertinent. In any event, because the carriers defending the pumpability factors did not try to justify the rate differentials by reference to any non- cost factor, he said that it would be appropri- ate to use the pumpability factors only if the "use of capacity" differences measured "greater cost," *id.* at 65,031, and ordered that future rate differences should not exceed cost differences.

The Commission reversed the finding of rate discrimination. *Amerada Hess Pipeline Corp.,* 68 FERC ¶ 61,057 (1994) ("Order on Exceptions"). It agreed that heavier petro- leum did not generate greater fixed costs, *id.*

at 61,192, and didn't dispute that the pumpa- bility factors do not properly measure differ- ences in variable costs such as additional fuel and drag-reducing agent. But it said that it was not bound by "strict cost-incurrence" principles in setting TAPS rates. Because the pumpability factors accurately measure "use of capacity" on TAPS, and "use of ca- pacity" was "an accepted method of allocat- ing joint and common [fixed] costs," *id.,* there was no discrimination. As to variable costs, the Commission provided no reasoning at all. The Commission denied the parties' requests for rehearing. 69 FERC ¶ 61,297 (Dec. 6, 1994) ("Order on Rehearing"). Peti- tioners here challenge the Commission's deci- sion on the use of pumpability factors as arbitrary and capricious under the Adminis- trative Procedure Act, 5 U.S.C. § 706(2)(A).

■ The intervenors question the standing of UPC and the State of Alaska. Because UPC raises no issues not raised by a party with indisputable standing, we pass over that issue. See *Watt v. Energy Action Edu- cational Foundation,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Ar- lington Heights v. Metropolitan Housing De- velopment Corp.,* 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977). As for the State of Alaska, intervenors harp on the fact that Alaska conceded that correc- tion of the alleged discrimination would cost it revenue in the short run. But Alaska also says that the current rate structure imposes penalties on the production of heavy petrole- um. The basic problem, as we shall see in discussion of the merits, is that the greater production costs associated with heavy oil mean that a rate tilt against it is likely to render a higher quantity of it uneconomical to produce—it evidently has no market ad- vantage over light oil, so that producers can- not charge a premium. And cutting short its production will adversely affect Alaska's oil tax revenue. Alaska also holds substantial oil royalties that are calculated based on the oil's value at the wellhead, which increases as transportation costs fall. See *State of Alas- ka v. FERC,* 980 F.2d 761, 762 (D.C.Cir. 1992); *Exxon Pipeline Co. v. United States,* 725 F.2d 1467, 1469, 1472 (D.C.Cir.1984).

We therefore reject intervenors' standing challenge.

Although the standard justification for a difference in rates is a difference in cost, all agree that in its application of § 2 of the Interstate Commerce Act the Commission may consider other factors as long as they further the purposes of the Act. *Harborlite Corp. v. ICC,* 613 F.2d 1088, 1100–1101 (D.C.Cir.1979); *United States v. Illinois Cent. R.R.,* 263 U.S. 515, 524, 44 S.Ct. 189, 193, 68 L.Ed. 417 (1924) (saying that test for discrimination under ICA is whether the difference in rates is "justified by the cost of the respective services, by their values, or by other transportation conditions"). For a full century, for example, the courts have understood the Act to authorize rate differences aimed at enabling a carrier to respond to competitive conditions in specific markets.[1] See, e.g., *Texas & Pacific Ry. v. ICC,* 162 U.S. 197, 218–19, 16 S.Ct. 666, 674–75, 40 L.Ed. 940 (1896); *Dresser Industries, Inc. v. ICC,* 714 F.2d 588, 595–96, 598, 600–01 (5th Cir.1983) (review under three different antidiscrimination provisions); *National Gypsum Co. v. United States,* 353 F.Supp. 941, 946–49 (W.D.N.Y.1973) (enumerating cases following this view). But the Commission must identify the non-cost factor it has deemed relevant and explain how the factor justifies the resulting rates. *Farmers Union Central Exchange, Inc. v. FERC,* 734 F.2d 1486, 1502 (D.C.Cir.1984).

■ The Commission justifies its departure from cost-based ratemaking on the theory that it is allocating fixed costs based on relative "use of capacity," which it says is measured by the pumpability factors. The Commission agreed that "fixed costs do not vary with relative use of capacity," 68 FERC at 61,192, but still found use of capacity to be an appropriate measure. But once heavier oil has been charged for extra fuel and drag-reducing agent (which no one claims to be much over 3 cents a barrel for Kuparuk petroleum), it is completely unclear in what

sense use of capacity, as measured by the pumpability factors, corresponds with anything related to the Commission's task under the Act. To be sure, a witness observed that the physical characteristics that cause the pumpability factors to affect maximum flow are at work even below the maximum rate, and also said that transporting heavier petroleum "takes more physical facilities." And the Commission said that "the pipeline's equipment 'works harder' transporting certain types of petroleum." Order on Rehearing, 69 FERC at 62,146. But given the concession that once the rate for heavier oil is adjusted for extra fuel and drag-reducing agent, cost is not affected by oil's heaviness, we are left with no clue as to how a "use of capacity" differential could contribute to any kind of rational pricing system. Moreover, as we mentioned before, the pipeline is always full (no air), so it is hard to see how there is any meaningful concept of capacity other than the flow rate, which under current conditions is unaffected by variations in viscosity and density so long as extra fuel and drag-reducing agent are used.

The Commission's invocation of its decision in *Texas Eastern Transmission Corp.,* 37 FERC ¶ 61,260 at 61,700, 1986 WL 215099 (1986) (*TETCO II*), reh'g granted in part, 41 FERC 61,015 (1987), aff'd. sub nom. *Texaco, Inc. v. FERC,* 886 F.2d 749 (5th Cir.1989), offers a glimpse into its possible reasoning. See Order on Exceptions, 68 FERC at 61,192 & n. 20 (citing *TETCO II*). In *TETCO II* the Commission justified charging firm customers with a portion of fixed costs based on their contract demand (i.e., their entitlement to ship gas), pointing out that a charge keyed to the amount of capacity reserved was necessary to assure that the customer made "a realistic reservation of capacity," 37 FERC at 61,700, thereby preventing a wasteful hoarding of space. But that has no application here now that the pipeline will never operate at capacity again: Each barrel of oil uses the same space and, as a practical mat-

---

1. Thus the ALJ erred in saying that Ramsey pricing would violate the Interstate Commerce Act. 64 FERC at 65,033. Indeed, the ICC officially adopted Ramsey pricing as its preferred model for some purposes. See *Burlington Northern R.R. v. ICC,* 985 F.2d 589, 591, 596 (D.C.Cir.

1993); *McCarty Farms v. Burlington Northern, Inc.,* 3 I.C.C.2d 822, 840 (1987) (referring to prior conclusion that Ramsey pricing was "the preferred and most accurate procedure available for determining the reasonableness of captive rates").

ter, the heavy ones differ only in causing extra fuel and drag-reducing agent costs that are far smaller than the hike caused by use of the pumpability factors.

In *TETCO II* the Commission also justified charging *interruptible* customers for part of the fixed costs of the pipeline, based on the amount of capacity their shipments actually *used,* even though the pipeline owner could simply refuse such shipments whenever the pipeline was at capacity. Here the Commission seems to be drawing the following analogy: If interruptible customers can be charged for capacity even though their demand probably played no role in causing the pipeline to incur capacity costs, then it is perfectly sensible for the Commission to approve a surcharge for heavy oil, which cannot in fact cause any additional costs to be incurred.

But in *TETCO II* the Commission offered an explanation for charging some fixed costs to interruptible shippers that does not seem to apply here. When entrepreneurs build a pipeline, the Commission said, they do so in anticipation not only of the original set of customers but also of new ones. Thus, the Commission reasoned, it made sense to allocate the costs among the present customers partly in accordance with their entitlements to use, partly in accordance with their actual use. 37 FERC at 61,701–02. The trouble is that that reasoning tells us nothing about why there should be a surcharge for what is, economically, a *non-use* characteristic.

There is another possible lesson from *TETCO II*. If it makes sense for pipeline recovery of fixed costs to rest in part on the builder's anticipation of use independent of the original customers, maybe it makes sense also to allow for recovery of fixed costs based on anticipation of extra opportunity cost differentials, even if a time comes when the differences in opportunity costs disappear. On their face, however, the cases seem quite different. In *TETCO II,* the Commission was speaking of a correct anticipation, while here the anticipation was ultimately falsified—at least for the current era and all expected future ones. In any event, if this is the Commission's theory it has not voiced it.

See *SEC v. Chenery Corp.,* 318 U.S. 80, 87–88, 63 S.Ct. 454, 459–60, 87 L.Ed. 626 (1943).

Whatever the significance of "use of capacity," which on this record appears rather mystical, there are some non-cost considerations that affirmatively cut *against* higher rates for heavier petroleum. The State of Alaska presented evidence that fields with heavier oil tend to have higher development costs, and therefore require higher value at the wellhead to justify initial development and continued production. Because value at the wellhead goes up as transportation tariffs go down (the wellhead price is a "netback" from the price of the oil delivered to a refiner), "production from marginal, heavier-crude fields is more likely to be responsive to TAPS tariff changes than is production from non-marginal, lighter-crude fields." If this is true, and it appears uncontested, the surcharge for heavier oil is the opposite of what the so-called "inverse-elasticity" rule would suggest. That rule, a shorthand label for Ramsey pricing, is a solution to the problem posed by the fact that it is impossible to use the theoretically efficient charges based on marginal cost for a natural monopoly; if an industry is a natural monopoly (i.e., if average costs are declining in the relevant range of production), charges based on marginal cost would not recover the firm's total costs. The theory of the inverse-elasticity rule is that allocation of joint costs in inverse proportion to the elasticities of demand of the different customers (here, shippers of heavy and light oil) will yield the most efficient practicable use of the resource (here, the pipeline), because it will minimize the uneconomical dampening of consumption that must inevitably result from charging more than marginal cost. William J. Baumol, "Ramsey Pricing," *in* 4 *The New Palgrave: A Dictionary of Economics* 49–50 (1994). While Alaska has not specifically cited as error the Commission's failure to apply the inverse-elasticity rule, it did argue the point against continued use of the pumpability factors, and the Commission's failure to respond to the point makes its choice yet more puzzling.

Finally, the Commission did not purport to address the question of variable costs. As we have seen, estimates of the cost of addi-

tional fuel and drag-reducing agent needed to move heavy barrels at the same rate as lighter ones under current TAPS conditions are at most about 3 cents a barrel. In addition, there is a surprisingly large component of variable costs that does not vary at all with the type of oil, namely the pipeline's return on equity. Under the TAPS Settlement Methodology this takes the form of a fixed figure (continuously adjusted for inflation) that is applied to each barrel shipped, no matter what the type of petroleum. This component is substantial; in 1992, it was about 83 cents a barrel, roughly 25% of total tariff rates that year. The 'Commission has offered no reason at all why this portion of variable costs should vary with the pumpability factors. Of course, if the Commission were to develop a theory for differentiating between light and heavy oil in the allocation of fixed costs, the logic of that theory might apply to variable costs as well.

But for now we cannot discern any adequate Commission theory for continuing any part of the pumpability surcharge for heavy oil. So we must reverse the Commission's decision and remand the case for its further consideration of the problem.

II. Publication of Certain Information in Tariff Form

The TAPS Operating Agreement, the private contract between TAPS carriers governing the operation of the system, provides for decisions on how much of available capacity a particular carrier may use at a given time. The allocation of space and costs among carriers depends partly on the type of petroleum each is carrying; petroleum other than standard petroleum (Sadlerochit) is converted to barrels of standard petroleum using the pumpability factors. If the volume of petroleum tendered to a particular carrier exceeds its designated capacity, the carrier must apportion the barrels so that each shipper gets a share of the capacity available to the carrier and the excess is shared among the other carriers. At the time this case arose, none of the carriers published in their tariffs the full details of (1) how they allocated space among themselves; (2) how they calculated the pumpability factors; or (3) how they apportioned capacity among shippers. Before the ALJ,

Commission staff argued that the carriers should be required to publish all these data in their tariffs. The TAPS carriers responded that the Commission lacked the statutory authority to require publication in the tariffs of material beyond that specified under the Interstate Commerce Act in 49 U.S.C. app. § 6(1), and that in any event such publication would be excessively burdensome. But to no avail. The ALJ held that publication in tariff form of all three sets of information, far from being forbidden by § 6, was necessary to fulfill it. 64 FERC at 65,039–40. The Commission affirmed the ALJ on that issue and adopted his reasoning. 68 FERC at 61,196.

Two of these sets of information are no longer at issue. Arco Transportation Alaska, Inc. ("ATA"), the carrier pursuing the tariff issues on appeal, says it has now published in its tariff the third requested set of data—the methods governing apportionment of capacity among shippers; "while it continues to disagree with the Commission's rationale for requiring such publication," it does not press that issue. And the Commission states that the summary of pumpability factors the carriers currently include in their tariffs "is sufficient to meet the requirements of Section 6." So we are left only with the issue of how the carriers allocate space among themselves.

Petitioners challenge the requirement as being "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Section 6 of the ICA requires oil pipelines to publish schedules showing all the rates, fares, and charges for transportation.... The schedules ... shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the ... shipper....

49 U.S.C. app. § 6(1). At the time of the Commission's decision, its regulation specifying the content of oil pipeline tariffs provided:

> Each carrier ... shall publish, post and file tariffs which shall contain ... all the rules governing rates and charges for [various listed services], absorptions, allowances, and all other charges and rules which in any way increase or decrease the amount to be paid on any shipment, or which increase or decrease the value of the service to the shipper.

18 C.F.R. § 341.10(a). (This regulation was since amended and recodified at 18 C.F.R. § 341.8, but the Commission staff has indicated that the revision "did not alter the substance" of the former regulation. No party argues that this change is material to the dispute.)

FERC's regulation fits the traditional understanding of § 6, as reflected, for example, in the Seventh Circuit's decision in *Atchison, Topeka & Santa Fe R.R. Co. v. ICC*, 607 F.2d 1199 (7th Cir.1979). There railroads sought review of an ICC decision requiring them to publish their operating schedules in tariff form. The court found that neither the text nor the legislative history of § 6 indicated that the Commission had the authority to require tariff publication of operating schedules. *Id.* at 1202. Rather, the legislative history "supports the conclusion [based on the text] that section 6 relates solely to the compulsory publication and posting of rates, fares, and charges." *Id.* The court noted that in some circumstances, operating schedules and other operating rules could be required to be published in tariff form where they formed "an integral part of the rates"—conceived of in terms of value or cost to the shipper. *Id.* at 1203. For instance, operating schedules might well affect the value of transportation to a shipper of perishable products. Since "[t]he operating schedules [in *Atchison*] were not shown to be integral elements of the rates or values of services," tariff publication could not be required. *Id.* This has long been the interpretation of § 6. See also *Bodine & Clark Livestock Comm'n Co. v. Great Northern Ry.*, 63 F.2d 472, 476 (9th Cir.1933); *Long Island R.R. v. United States*, 307 F.Supp. 988, 993 (E.D.N.Y.1969); *Merchants Refrigerating Co. v. N.Y. Central R.R.*, 238 ICC 599, 604 (1940).

■ This interpretation of the section—focusing on costs or value to the shipper—fits with its purpose, which was to prevent rate discrimination. "The purpose of Congress in the enactment of section 6 of the Interstate Commerce [ ] Act ... is obviously to provide for a system of tariff schedules, rates, fares, and charges which would be uniform and consistent and apply without discrimination or favoritism to all shippers similarly situated." *Alton & So. R.R. v. United States*, 49 F.2d 414, 422 (N.D.Cal. 1931) (three-judge court). See also *Central & So. Motor Freight Tariff Ass'n v. United States*, 273 F.Supp. 823, 832 (D.Del.1967) ("The legislative purpose behind § 6 was to supplement § 2. It was thought that notoriety of rates would militate against discrimination and preferential treatment."). It is not necessary to know every detail of how a carrier operates to determine whether rate discrimination has occurred.

Of course the carriers' methods for allocating space among themselves presumably have a bearing on their costs and thus their rates. And § 6 calls for tariff publication of "any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges." But the only reading of this clause that would encompass the allocation arrangements in dispute here is one that would require tariff publication of all minutiae bearing upon cost—at least if in any way reflected in a "rule or regulation," as, for example, would be any rule stated in a carrier's contract with any of its suppliers. Even the Commission does not suggest so extravagant a reading of § 6.

■ FERC makes a feeble effort to justify the requirement on the grounds that the allocation rules have some effect on the value of service to a shipper. The Commission states without elaboration that "[s]hippers are entitled to a reasonably clear indication ... from TAPS Carriers when their petroleum will be shipped—certainly a matter directly affecting the value of a Carrier's service." (We cannot see that it used

this justification below.) When pressed at oral argument, counsel for FERC was unable to explain either whether the allocation rules in fact affect the timing of shipping to a significant degree or why shippers would care if they did (within reasonable limits). After all, theirs is not the situation of shippers of perishable goods, and *Atchison* shows that courts will not allow agencies to require publication of operating schedules in tariff form without some indication it makes a difference to shippers. The Commission cannot require tariff publication of any detail it finds convenient.

Publication in tariff form entails quite serious consequences. First, it binds "both carriers and shippers with the force of law," and thus "might well expand the potential liability of carriers to damage claims" if the tariff requirements were not fulfilled. *Atchison,* 607 F.2d at 1206. Second, and more importantly from FERC's point of view, any changes to the tariff can only be made after giving the Commission 30 days' advance notice and an opportunity to suspend the tariff under 49 U.S.C. app. § 15(7). In the ensuing proceeding the burden would fall on the carrier to justify the change. *Id.* In contrast, if a shipper files a complaint against a nontariff operating rule, the burden is on the complainant to show that the existing policy is unlawful. 49 U.S.C. app. § 13(1). Before the ALJ, the Commission staff was very clear about wanting this result of inclusion in the tariffs. FERC staff may well want control over the minutiae of the carriers' operations, but Congress did not give it to them.

We assume that the allocation policy might become pertinent in some proceeding over rate discrimination. But publication in the tariff is hardly necessary to the data's availability for that purpose. As ATA points out, "[t]he issue is not whether this information can or must be disclosed in a validly-instituted investigation, or even whether the Commission could require the carriers to make this information available to shippers in some other form." (Counsel for ATA said at oral argument that ATA did not object to the latter.)

\* \* \*

We therefore reverse the Commission's determination that pumpability factors be used to calculate rate differentials on the pipeline and remand the case for its renewed consideration. We also reverse the Commission's decision to require publication of the operating rules governing allocation of capacity among the carriers in tariff form.

*So ordered.*