# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 15, 2005    Decided May 31, 2005

           Reissued July 29, 2005

No. 04-1079

BROOKLYN UNION GAS COMPANY, *D/B/A* KEYSPAN ENERGY
DELIVERY NEW YORK, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

INDEPENDENT OIL & GAS ASSOCIATION OF WEST VIRGINIA,
ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Kenneth T. Maloney* argued the cause for petitioners. With him on the briefs were *Christopher M. Heywood* and *Thomas P. Thackston*.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This case presents the following question: may the Federal Energy Regulatory Commission hold a gas pipeline and its customers to a rate settlement when all parties but one agree to abrogate it? Under the circumstances of this case, we conclude that it may.

## I.

In the spring of 2002, two natural gas pipelines, Equitrans, L.P. and Carnegie Interstate Pipeline Co., sought FERC's approval to merge their two companies. Fearing the merger would lead to higher shipping rates, several parties objected. To appease them, Equitrans proposed a settlement under which it would maintain existing rates until at least March 31, 2005. Following some adjustments, the protesting customers withdrew their objections to the merger and endorsed the proposed settlement.

But pleasing these shippers meant displeasing gas producers. Under a prior settlement involving all parties to this litigation, Equitrans had agreed to file a rate case proposing rates to take effect no later than August 1, 2003. Claiming to have accepted "significant rate concessions" in exchange for this sunset, gas producers represented by the Independent Oil & Gas Association of West Virginia ("IOGA"), a trade association, insisted on maintaining the existing agreement's rate case filing deadline. They argued that the new proposal "would, for no apparent consideration, terminate that obligation— permanently."

Under the Natural Gas Act, FERC must ensure that gas rates are "just and reasonable." 15 U.S.C. § 717c(a). "[I]n view

of IOGA's objections," the Commission concluded that the proposed rates fell short of that standard. *See Equitrans, L.P.*, 104 F.E.R.C. ¶ 61,008, at 61,018 (2003). FERC therefore rejected the settlement, though it did approve the Equitrans-Carnegie merger. *Id.* at 61,014. Although Equitrans and other settlement proponents had encouraged FERC to sever IOGA from the proceedings and approve the settlement as to all other parties, the Commission explained that postponing general rate litigation beyond the agreed-upon date would deprive IOGA of the benefit of its bargain, thus undermining FERC's policy of encouraging rate settlements. *See id.* at 61,019. "[R]ejection of this settlement," the Commission declared, "will provide parties assurance that when they bargain to reach a settlement it will not be superceded by a later settlement, notwithstanding their opposition," except in truly "exceptional circumstances justifying abrogation of the original settlement." *Id.*

The jilted Equitrans customers—though not Equitrans and Carnegie—sought rehearing. Sticking to its guns, FERC reiterated that "[a]pproval of a settlement under the circumstances presented here would risk undermining confidence in the settlement process." *Equitrans, L.P.*, 106 F.E.R.C. ¶ 61,013, at 61,034 (2004). The prior settlement thus remained in effect, requiring Equitrans to initiate new rate litigation. Equitrans did so, and on September 1, 2004 (following a delay due to inadequate documentation in Equitrans's initial submission), new provisional rates took effect, subject to refund, while the parties awaited a hearing in Equitrans's case. *See Equitrans, L.P.*, 109 F.E.R.C. ¶ 61,214 (2004); *Equitrans, L.P.*, 105 F.E.R.C. ¶ 61,407 (2003). For some shippers, the new rates exceeded the old by more than fifty percent.

Petitioners are Equitrans customers who sought severance of IOGA and approval of the settlement. Pursuant to the Natural Gas Act, 15 U.S.C. § 717r(b), and Administrative Procedure

Act, 5 U.S.C. § 706, they now seek review of FERC's rejection of their position and denial of rehearing.

## II.

In its brief, FERC questions petitioners' standing to sue. But when pressed at oral argument, FERC counsel stated, "I don't think I'd go so far as to withdraw [the standing argument], but I will concede that my argument time might be better spent on the merits." A wise strategic decision, we think. By exposing petitioners to higher provisional rates, FERC's rejection of the proposed settlement inflicted a concrete injury that Commission-ordered refunds could correct, thus giving petitioners standing to pursue their claims here. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (identifying the "irreducible constitutional minimum of standing" as (1) "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) likelihood that "the injury will be redressed by a favorable decision" (internal quotation marks omitted)).

Turning to the merits, we review FERC's action under familiar APA standards, overturning the disputed orders only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999). Although "[t]he Commission must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record," our review is "highly deferential." *Id.* at 948 (internal quotation marks omitted). Indeed, with respect to rate settlements specifically, we have described FERC's discretionary standards as "quite generous and flexible." *Arctic Slope Reg'l Corp. v. FERC*, 832 F.2d 158, 164 (D.C. Cir. 1987). As petitioners see it, FERC abused this discretion in two respects: the challenged orders conflict with Commission precedent and FERC's reliance on the

first settlement to reject the second was unreasonable. Neither argument is convincing.

Regarding FERC precedent, petitioners focus primarily on *Trailblazer Pipeline Co.*, 106 F.E.R.C. ¶ 61,034 (2004) ("*Trailblazer II*"), in which the Commission severed an objecting party and approved an otherwise undisputed settlement, much as petitioners hoped FERC would do here. But despite its name, *Trailblazer II* comes too late for petitioners, because FERC decided it nine days *after* denying rehearing in this case. Although agencies must either abide by their precedent or provide a "reasoned explanation" for departing from it, *see Exxon Mobil Corp. v. FERC*, 315 F.3d 306, 309 (D.C. Cir. 2003), we too follow precedent, and our case law says, "We will not reach out to examine a decision made after the one actually under review. . . . An agency's decision is not arbitrary and capricious merely because it is not followed in a later adjudication." *MacLeod v. ICC*, 54 F.3d 888, 892 (D.C. Cir. 1995).

In footnotes and in their reply brief, petitioners cite several authentic agency precedents—among others, *Texas Gas Transmission Corp.*, 98 F.E.R.C. ¶ 61,244 (2002), *on reh'g*, 99 F.E.R.C. ¶ 61,328 (2002), *Wyoming Interstate Co.*, 92 F.E.R.C. ¶ 61,256 (2000), and an earlier decision involving the same pipeline as *Trailblazer II*, i.e., *Trailblazer Pipeline Co.*, 85 F.E.R.C. ¶ 61,345 (1998), *on reh'g*, 87 F.E.R.C. ¶ 61,110 (1999), *on reh'g*, 88 F.E.R.C. ¶ 61,168 (1999) ("*Trailblazer I*"). As petitioners concede, however, none of these cases (nor for that matter *Trailblazer II*) involved abrogation of any preexisting rate filing obligation. Thus, petitioners' precedent-based argument stands or falls with their overall reasonableness challenge. If FERC's explanation for its action—that approving the second settlement notwithstanding the first would violate its pro-settlement policy—makes sense, then the challenged orders

were not only justifiable in their own right, but also distinguishable from Commission precedent.

We see nothing unreasonable in FERC's decision. As FERC explained, "The Commission . . . is concerned that the [proposed] settlement would by its terms declare a previously approved settlement of no force and effect, despite the objection of a party to the earlier settlement." 104 F.E.R.C. at 61,019. In the order on rehearing, FERC elaborated:

> Approval of a settlement under the circumstances presented here would risk undermining confidence in the settlement process. The Commission believes that a party to a rate settlement generally should be able to rely upon the terms and conditions of that settlement until a new rate case can be conducted . . . . Parties to a settlement should not have to worry that other parties to the settlement may, at a later date, do an "end run" in a proceeding not involving the subject matter of the settlement, and change the settlement without all of the parties' consent.

106 F.E.R.C. at 61,034. Like FERC, we think it obvious that pipelines and their customers might hesitate to enter rate settlements if a subset of settling parties could later pull the rug out from under them. Accordingly, although petitioners point out that approval of the proposed agreement here could have brought significant benefits such as "rate certainty" and reduced litigation costs, FERC hardly abused its discretion in holding that a strong commitment to preexisting settlements would better serve the public interest than allowing modifications over the objection of one or more parties.

Nor did FERC act irrationally in concluding that IOGA had legitimate grounds to insist on the rate filing obligation. According to petitioners, separate adjudication of IOGA members' rates would have fully protected their interests, thus removing any need for general rate litigation. Yet as FERC

pointed out, "even if the IOGA members are not themselves shippers on Equitrans' or Carnegie's system, these producers have reserves located in a geographic region where they can access Equitrans' or Carnegie's facilities as a path to market." 104 F.E.R.C. at 61,019. Hence, the Commission explained, the IOGA members' interests go beyond their own direct shipping rates. They also "have an interest in the rates that shippers who purchase their gas pay for transportation service since . . . those rates affect the producers' netback." *Id.*

We pause to translate. "Netback," it seems, is oil and gas argot for the effect of shipping costs on producer profits. As producers upstream from the pipeline, IOGA members can deliver gas to end users only if someone pays Equitrans's rates. Hence, whether they contract for shipping themselves or leave that to a shipper or customer, the gas's value at the source is the "net" of the overall consumer price minus shipping costs. *Cf. ARCO Alaska, Inc. v. FERC*, 89 F.3d 878, 883 (D.C. Cir. 1996) (explaining with respect to petroleum development that "value at the wellhead goes up as transportation tariffs go down" because "the wellhead price is a 'netback' from the price of the oil delivered to a refiner").

FERC has previously acknowledged that netback pricing concerns give producers a valid interest in transportation rates charged to third parties such as shippers and consumers. *See, e.g.*, *Trailblazer I*, 87 F.E.R.C. at 61,442 (describing a gas producer's ownership of "significant reserves located in a geographic region where they are accessible to use [the pipeline's] system as a path to a market" as "sufficient to give [the producer] a significant interest in [the pipeline's] rates"). In effect, so have we. In *Arctic Slope*, although we approved FERC's severance of the owner of "substantial possible and proven oil reserves" from a settlement affecting rates on a pipeline that constituted "the only possible method of transport" for that owner's oil, we did not do so on grounds that the owner

lacked any interest in the shipping rates of settling parties.  *See Arctic Slope*, 832 F.2d at 160.   Rather, making a point comparable to FERC's netback pricing theory, we emphasized that "the settlement currently affects [the oil owner's] interests," for the "level of bonus and royalty payments" the owner could negotiate were "potentially affected by transportation costs in bringing oil via [the pipeline] to market."  *Id.* at 160, 167; *see also id.* at 164 n.10.

We readily admit that in other contexts, even apart from *Trailblazer II*, FERC seems to have assigned less significance to netback pricing concerns.  In *Trailblazer I*, for example, while recognizing a producer's "substantial interest" in third-party shippers' rates, the Commission held that severance would protect that interest, for the producer could structure its transactions to take advantage of either its separate litigated rate or rates charged to settling shippers, whichever was lower.  *See* 88 F.E.R.C. at 61,569.  But again, neither *Trailblazer I* nor any other case cited by petitioners involved conflict with a previous settlement.  Moreover, even assuming IOGA members could likewise structure their dealings to avoid significant harm, petitioners appear not to have raised this issue before the Commission, so we may not consider it here.  *See* 15 U.S.C. § 717r(b).

Simply put, petitioners signed an agreement calling for a general rate case by a specified date, and the IOGA producers' ownership of gas supplies upstream from the pipeline gave them a reason, acknowledged in FERC precedent, to insist on that deadline.  That is enough to justify FERC's action in this case.  Had petitioners wished to preserve the option of postponing the rate case, they should never have agreed to the mandatory sunset contained in the first settlement.  Accordingly, we deny the petition for review.

*So ordered.*